# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CHRISTOPHER S. MARSHALL**                                    **CIVIL ACTION**

**VERSUS**                                                          **No. 11-10**

**HARTFORD LIFE AND ACCIDENT**                              **SECTION "I"**
**INSURANCE COMPANY**

### ORDER AND REASONS

Before the Court are cross-motions[1] for summary judgment filed by defendant, Hartford

Life and Accident Insurance Company ("Hartford"),[2] and plaintiff, Christopher S. Marshall

("Marshall"), with respect to the amount of long-term disability ("LTD") benefits to which

Marshall is entitled pursuant to the Employee Retirement Income Security Act of 1974

("ERISA," 29 U.S.C. § 1001, *et seq.*).  For the following reasons, Hartford's motion for

summary judgment is **GRANTED** and Marshall's motion for summary judgment is **DENIED**.

### *BACKGROUND*

While employed with Nalco Chemical Company ("Nalco"), an affiliate of Suez USA,

Inc. ("Suez"), Marshall suffered a disabling work-related injury on June 21, 2003.[3]  Prior to and

after the accident, Suez sponsored a group long-term disability ("LTD") benefit plan ("the

policy") under which Marshall is a covered employee.[4]  CNA Group Life Assurance Company

---

[1] R. Doc. Nos. 32 and 33.
[2] The factual background of this case involves several entities with names containing "Hartford."  For the sake of clarity, the Court refers only to the named defendant, Hartford Life And Accident Insurance Company, as "Hartford."
[3] R. Doc. No. 1-1, pp. 2-3.
[4] R. Doc. No. 1-1, p. 3.

("CNA") underwrote and administered the policy.  Effective November 30, 2003, Hartford purchased one hundred percent of CNA's issued and outstanding stock and, as a result of the transaction, Hartford became responsible for administering and paying claims arising under certain CNA policies, including the policy covering Marshall.[5]  CNA's name was changed to Hartford Life Group Insurance Company ("HLGIC") effective December 31, 2003.[6]  HLGIC and Hartford Life and Accident Insurance Company (the defendant) merged effective December 31, 2006, with the defendant, Hartford, as the surviving entity.[7]

Due to the injury that Marshall sustained, Marshall's treating physician declared him incapable of returning to work because he was totally and permanently disabled.[8]  Pursuant to the policy, Hartford began paying Marshall LTD benefits in November 2004.[9]  Marshall disputed Hartford's benefit calculations, arguing that they underrepresented the amount of benefits he was due because Hartford did not include all wages that Marshall earned in 2003.[10]

Marshall filed this lawsuit in December 2010 in the 23rd Judicial District Court, Parish of St. James, State of Louisiana (*Christopher S. Marshall v. The Hartford Life and Accident Insurance Company*, docket no. 34306) seeking a declaratory judgment regarding the amount of past and future benefits due under the policy.[11]  Hartford timely removed the lawsuit to the Eastern District of Louisiana asserting federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331.[12]

---

[5] R. Doc. No. 32-1, p. 61.
[6] R. Doc. No. 32-1, p. 61.
[7] R. Doc. No. 32-1, p. 61.
[8] R. Doc. No. 1-1, p. 3.
[9] R. Doc. No. 1-1, p. 3.
[10] R. Doc. No. 1-1, pp. 3-4.
[11] R. Doc. No. 1-1, pp. 6-7.
[12] R. Doc. No. 1.

Hartford argues that it has calculated Marshall's benefits pursuant to the policy's terms. Hartford submits that a qualifying employee receives benefits totaling sixty percent of his "Monthly Earnings," less deductible sources of income.[13]  With respect to the definition of "Monthly Earnings," the policy provides that "it does not include . . . overtime pay."[14]  Hartford maintains that because the policy "expressly and unequivocally excludes 'overtime pay,' " Marshall is not entitled to benefits based on any overtime that Marshall worked.[15]  Consequently, "Hartford has utilized Plaintiff's hourly rate as of the date of his asserted disability and multiplied it times forty (40) hours per week for full-time employment."[16]

Marshall counters that Hartford is required to use all of his 2003 salary when determining his Monthly Earnings under the policy, not merely forty hours per week multiplied by his hourly rate, because his "overtime" hours were actually mandatory.  Accordingly, Marshall asserts that all of his wages were part of the monthly "earnings" that he was receiving.[17]  The parties agree that the only issue before this Court is the proper calculation of Marshall's Monthly Earnings and, accordingly, the amount of his LTD benefits.[18]

### *LAW AND ANALYSIS*

### I.   Summary Judgment Standard

Summary judgment is proper when, after reviewing "the pleadings, the discovery and disclosure materials on file, and any affidavits," the court determines there is no genuine issue of material fact.  Fed. R. Civ. P. 56(c).  The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those

---

[13] R. Doc. No. 32-1, p. 20.
[14] R. Doc. No. 32-1, p. 21.
[15] R. Doc. No. 32-4, p. 2.
[16] R. Doc. No. 32-4, pp. 7-8.
[17] R. Doc. No. 33-1, p. 2.
[18] R. Doc. Nos. 33-1, p.1 and 32-4, p. 2.

portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. *Celotex*, 477 U.S. at 323; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56(c), the other party must come forward with specific facts showing that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating " 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.* The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; see *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

## II.      Standard of Review Under ERISA

A court must review a denial of ERISA benefits under a *de novo* standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 99, 115 (1989); *Wegner v. Standard Insurance Co.*, 129 F.3d 814, 818 (5th Cir. 1997). If a

plan "gives the Plan Administrator the discretionary authority to construe the Plan's terms and to render benefit decisions," then a Court must review the administrator's decisions subject to an abuse of discretion standard.  *Holland v. Int'l Paper Co. Retirement Plan*, 576 F.3d 240, 246 (5th Cir. 2009).

Hartford argues that it had discretionary authority to interpret the policy and that the Court must apply the abuse of discretion standard of review.[19]  Marshall disputes whether Hartford had discretionary authority because the policy states that CNA, not Hartford, is the entity to which discretionary authority is delegated.  Consequently, Marshall insists that the Court must apply a *de novo* standard of review.[20]

Hartford's argument is grounded on the policy language and the legal effect of Hartford's acquisition of CNA.  The policy covering Marshall contains a section titled ***DISCRETIONARY AUTHORITY***, which provides:

> The Policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent applicable, by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments thereto.  The plan administrator and other plan fiduciaries have discretionary authority to determine Your eligibility for and entitlement to benefits under the Policy.  The plan administrator has delegated sole discretionary authority to CNA Group Life Assurance Company to determine Your eligibility for benefits and to interpret the terms and provisions of the plan and any policy issued in connection with it.[21]

Accordingly, the policy clearly states that the plan administrator has delegated discretionary authority to CNA to interpret the "terms and provisions" of the policy.

As state, CNA's name was changed to HLGIC effective December 31, 2003, and HGLIC issued an endorsement to the policy, which provides:

---

[19] R. Doc. No. 32-4, p. 11.
[20] R. Doc. No. 33-1, p. 3.
[21] R. Doc. No. 32-1, p. 59.

5

> This endorsement is made a part of, and terminates and takes effect at the same time as, the policy or certificate to which it is attached.  It amends the policy or certificate as stated below:
>
> > The name of CNA Group Life Assurance Company is replaced with the name Hartford Life Group Insurance Company wherever it appears.
>
> In all other respects, the policy and certificate to which this amendment is attached will remain the same.[22]

As a result of this endorsement, HGLIC's name replaced CNA's name throughout the policy, including in the provision regarding the grant of discretionary authority.  Hartford and HGLIC merged effective December 31, 2006, with Hartford as the surviving entity.[23]

Hartford also submits the declaration of Leslie Soler ("Soler"), the lead in-house mergers and acquisitions counsel that negotiated the transaction wherein Hartford purchased all of CNA's stock.  Soler declares that, due to the merger, Hartford as the surviving entity became the successor-in-interest to "policies issued and underwritten by CNA," including the policy covering Marshall.[24]  Accordingly, Hartford argues, it acquired discretionary authority in administering the policy.[25]

Marshall argues that the Court cannot rely on Soler's declaration and that Hartford must produce the "actual, legal and binding documents between CNA and Hartford evidencing transfer of the Policy at issue" in order for the Court to determine whether Hartford has discretionary authority.[26]  However, Marshall cites no caselaw supporting his argument.  Other districts courts, faced with the same issue regarding whether Hartford acquired discretionary authority through its acquisition of CNA, have answered the question in the affirmative.  These

---

[22] R. Doc. No. 32-1, p. 1.
[23] R. Doc. No. 31-1, p. 2.
[24] R. Doc. No. 32-1, p. 60.
[25] R. Doc. No. 32-4, p. 11.
[26] R. Doc. No. 37, pp. 2-3.

courts have found that because Hartford "stepped into the shoes" of CNA, Hartford acquired

discretionary authority to interpret the policy and determine eligibility for benefits.  *See, e.g.,*

*Hunley v. Hartford Life and Accident Ins. Co.*, 712 F. Supp. 2d 1271, 1281 (M.D. Fl. 2010)[27]

("Ms. Stoler's [sic] affidavit states Hartford purchased 100% of the CNAGLA stock on

November 30, 2003.  Although the language of the Plan originally granted discretionary

authority to CNAGLA, Hartford purchased the Plan and all of the rights and obligations to

administer the Plan when it purchased all of CNAGLA's stock.  Hartford 'stepped into the shoes'

of CNAGLA when it purchased 100% of its stock.  Because Hartford purchased all of the rights

and obligations of the Plan in the Stock Agreement, it acquired discretionary authority to

administer the Plan.") (docket citations omitted); *Simonia v. The Hartford Ins. Co.*, 606 F. Supp.

2d 1091 (C.D. Cal. 2009).  Because the policy covering Marshall granted discretionary authority

to CNA, and because Hartford became the successor-in-interest to CNA, the Court finds that

Hartford has discretionary authority to interpret the policy.  Accordingly, the Court will review

Hartford's calculation of Marshall's LTD benefits subject to an abuse of discretion standard.

### III.    Abuse of Discretion

The Fifth Circuit has outlined a "two-step analysis in determining whether a plan

administrator abused its discretion in construing plan terms."  *Vercher v. Alexander & Alexander*

*Inc.*, 379 F.3d 222, 227 (5th Cir. 2004) (citing *Rhorer v. Raytheon En'rs and Const'rs, Inc.*, 181

F.3d 634, 639 (5th Cir. 1999)).  As the Fifth Circuit recently explained in *Stone v. UNOCAL*

*Termination Allowance Plan*, 570 F.3d 252, 257 (5th Cir. 2009):

---

[27] The Court has reviewed the LTD policy filed as an exhibit to Hartford's motion for summary judgment (Case No. 08-2008, R. Doc. No. 21) in the U.S. District Court for the Middle District of Florida.  As in this case, the policy was originally issued by CNA and was later acquired by Hartford.  The policy contains the same language at issue in this case.

First, we determine whether the [administrator's] determination was legally correct. [*Crowell v. Shell Oil Co.*, 541 F.3d 295, 312 (5th Cir. 2008)].  If so, the inquiry ends and there is no abuse of discretion. *Id.* Alternatively, if the court finds the administrator's interpretation was legally incorrect, the court must then determine whether the administrator's decision was an abuse of discretion. *Id.*; *Aboul-Fetouh v. Employee Benefits Comm.*, 245 F.3d 465, 472 (5th Cir. 2001). Only upon reaching this second step must the court weigh as a factor whether the administrator operated under a conflict of interest. *See White*, slip op. at 1-2; *Crowell*, 541 F.3d at 312.

*Stone*, 570 F.3d at 257.[28]

In determining whether an administrator's interpretation is legally correct, a court must consider three factors: " '(1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan.' " *Id.* at 258 (quoting *Crowell*, 541 F.3d at 312).  The most important factor in this analysis is "whether the administrator's interpretation was consistent with a fair reading of the plan." *Id.* (citing *Crowell*, 541 F.3d at 313).  If a court finds that the administrator's interpretation was not legally correct, then it must resolve whether an administrator has abused its discretion.

## IV.   First Step: Legally Correct Interpretation

### A.   Uniform Construction

The first factor – whether a plan administrator has given the plan a "uniform construction" – of the legally correct interpretation analysis scrutinizes whether the administrator consistently applied the plan to similarly situated persons covered under the policy.  *Stone*, 570 F.3d at 258; *see also Crowell*, 541 F.3d at 314 and 314 n.83; *Batchelor v. International Broth. of Elec. Workers Local 861*, 877 F.2d 441, 444-45 (Fifth Cir. 1989).  Marshall has not alleged that

---

[28] Marshall argues that the Court must consider Hartford's purported conflict of interest because it is an insurance carrier also serving as the claims administrator.  R. Doc. No. 33-1, p. 7.  However, the Court notes that, following Fifth Circuit precedent, consideration of such a conflict only informs a court's analysis if the court determines that the administrator's interpretation of the plan is not legally correct.  *Stone*, 570 F.3d at 257-58.

8

Hartford has inconsistently applied the plan to similarly situated persons – that is, that any similarly situated persons who sought benefits based on what they believed to be mandatory overtime "were treated differently" when compared to Marshall.  *Stone*, 570 F.3d at 259.  Where there is no evidence that applicable provisions of a plan "have been interpreted in light of claims" like Marshall's, this factor is viewed as "neutral."  *Tolson v. Avondale Industries*, 141 F.3d 604, 608 (5th Cir. 1998).  Accordingly, the Court will not draw any inferences in favor of either party regarding this factor.

### B.  Fair Reading

Again, the second factor – whether the plan administrator's interpretation is consistent with a "fair reading of the plan" – is the most important factor in the legally correct interpretation analysis.  *Stone*, 570 F.3d at 260 (citing *Crowell*, 541 F.3d at 313).  The heart of Marshall's argument goes to whether Hartford's interpretation is consistent with a "fair reading" of his LTD policy.[29]  Marshall asserts that because the word "overtime" is not defined in the policy, and because his "overtime" wages were not truly overtime at all, but really mandatory hours Nalco required him to work, Hartford is required to include all of his wages from 2003 when calculating his LTD benefits.  Marshall further maintains that the policy's provision that "earnings are specifically defined to include all '[s]alary and commissions based on the average earnings from a calendar year immediately preceding *Your* date of loss' " supports his argument.[30]  According to Marshall, the ambiguity created due to the interplay of the terms overtime and earnings makes the policy ambiguous.  Consequently, Marshall concludes, the

---

[29] R. Doc. Nos. 33-1, pp. 4-5 and 37, pp. 4-5.
[30] R. Doc. No. 33-1, p. 6.

court must apply the rule of *contra proferentum* and construe the policy in his favor such that all of his wages are included when calculating his LTD benefits.[31]

With respect to whether a plan administrator's interpretation is consistent with a "fair reading" of a plan, the Fifth Circuit has stated that "eligibility for benefits is governed in the first instance by the plain meaning of the plan language." *Stone*, 570 F.3d at 260 (internal quotations omitted). "ERISA plans are interpreted in their ordinary and popular sense as would a person of average intelligence and experience." *Id.* (internal quotations omitted). "Thus, plan provisions must be interpreted as they are likely to be understood by the average plan participant." *Id.* (internal quotations omitted). "Only if the plan terms remain ambiguous after applying ordinary principles of contract interpretation" is a court "compelled" to apply *contra proferentum* and construe the plan's terms strictly in favor of the insured. *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 818-19 (5th Cir. 1997). The Court, looking to the plain meaning of the policy's language in light of the ordinary and popular sense of the word "overtime," finds that Hartford's interpretation of the policy is in line with a fair reading of the policy's language.

The policy provides that an injured employee, such as Marshall, receives LTD benefits in the amount of sixty percent of his "monthly earnings" less his deductible sources of income. The policy defines "monthly earnings" as:

> the monthly wage or salary that *You* were receiving from *Your* Employer on the Date of Disability. It includes:
>
> 1) employee contributions made through a salary reduction agreement with *Your* Employer to an IRC 401(k), 403(b), 501(c)(3), 547 deferred compensation plan, or any other qualified or non-qualified employee *Retirement Plan* or deferred compensation arrangement; and

---

[31] R. Doc. No. 37, pp. 4-5.

2) amounts contributed to *Your* fringe benefits according to a salary reduction arrangement under an IRC Section 125 plan.

3) Salary and commissions based on the average earnings from the calendar year immediately preceding *Your* date of loss or the length of employment, if less; and

4) Shift differential earnings based on the average earnings from the calendar year immediately preceding *Your* date of loss or the length of employment, if less.

It does not include:

1) bonuses;

2) overtime pay;

3) *Your* Employer's contribution on *Your* behalf to a *Retirement Plan* or deferred compensation arrangement; or any other extra compensation.[32]

Marshall argues that Hartford was required to calculate his benefits with respect to the entire amount of wages he received in 2003 because the policy states that "earnings" is defined to "include all '[s]alary and commissions based on the average earnings from a calendar year immediately preceding *Your* date of loss.' "[33]  However, the sentence Marshall quotes is quite clearly followed by the qualification that monthly earnings "does not include . . . overtime pay."[34]

The Fifth Circuit, in construing the word "overtime" where the term was undefined in an ERISA-covered plan, has acknowledged that "the concept of 'overtime' ordinarily applies only to hourly employees."  *Wegner*, 129 F.3d at 818-19.  "[O]nce the employee exceeds his assigned number of hours, he is paid at a higher hourly rate for the excess."  *Id.* at 819.  The wage

---

[32] R. Doc. No. 32-1, p. 21 (italics in original).
[33] R. Doc. No. 33-1, p. 6.  The policy does not state that benefits are determined in reference to "earnings."  Rather, the policy provides that "[y]*our LTD Monthly Benefit* will be based on *Your Monthly Earnings*," which is the "wage or salary" that the employee was earning prior to becoming disabled.  R. Doc. No. 32-1, p. 20 (italics in original).
[34] R. Doc. No. 32-1, p. 21 (italics in original).

documents that Marshall has submitted indicate that Nalco classified him as an hourly employee.[35]

The Fair Labor Standards Act of 1938 ("FLSA," 29 U.S.C. § 201, et seq.) mandates that employers cannot require employees who "are not specifically exempt from [the Act's] overtime pay requirements" to work more than forty hours per week.[36]  29 U.S.C. § 207; 29 C.F.R. § 778.100.  If an employer does require an employee to work more than forty hours per week, then the employer must compensate the employee for the hours worked in excess of forty hours at "a rate not less than one and one-half times the regular rate at which he is employed."  *Id.*  Such hours in excess of forty hours per week, by law, constitute "overtime."[37]  Nalco's company policy on pay practices recognizes that it must comply with the FLSA's overtime requirements, stating that "[o]vertime is paid (by law) for work over 40 hours in one week."[38]

Given that Nalco compensated Marshall as an hourly employee, Nalco separated the wages it paid Marshall into the categories of "Regular Hours" and "Overtime."[39]  To determine Marshall's benefits, Hartford requested Marshall's wage history for his work at Nalco.[40]  Nalco provided Hartford with wage documentation classifying wages paid as either "Regular Hours"

---

[35] R. Doc. No. 33-2, pp.  5-8.

[36] Marshall contends that Hartford cannot look to the FLSA to inform the meaning of the "overtime."  R. Doc. No. 37, p. 4.  However, the FLSA's provisions are mandatory and any hours that Marshall worked in excess of forty hours per week as an hourly employee must be compensated at the FLSA's "time and a half" overtime rate.

[37] With respect to the FLSA, 29 C.F.R. § 778.101 provides:

> As a general standard, section 7(a) [29 U.S.C. § 207] of the Act provides 40 hours as the maximum number that an employee subject to its provisions may work for an employer in any workweek without receiving additional compensation at not less than the statutory rate for overtime.  Hours worked in excess of the statutory maximum in any workweek are overtime hours under the statute . . . .

[38] R. Doc. No. 33-2, p. 58.
[39] R. Doc. No. 33-2, pp.  5-8.
[40] R. Doc. No. 33-2, pp. 48-50.

and "Overtime." [41]   Based on the policy language excluding "overtime pay" and Nalco's classification of Marshall's wages as deriving from either "Regular Hours" or "Overtime," Hartford excluded "Overtime" wages in its calculation of Marshall's benefits and paid benefits based on forty hours of work per week that were not determined to be overtime.[42]

The Court finds that Hartford's interpretation of the plan as excluding wages for any hours worked in excess of forty hours per week to be a fair reading of the plan.  Accordingly, the Court finds that the most important factor of the "legally correct" analysis weighs in Hartford's favor.

### C.  Any Unanticipated Costs

The final factor examines whether Marshall's interpretation of the plan would result in unanticipated costs.  *Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 271-72 (5th Cir. 2004).  The policy provides that the premiums a covered employee must pay for LTD coverage are based on the employee's monthly earnings as reported to Hartford by the employee's employer.[43]  Consequently, because Hartford excluded overtime pay when determining monthly earnings and when calculating the premiums that Marshall must pay, Marshall's argument that he is entitled to additional benefits would result in unanticipated costs.  Hartford would have to provide benefits in excess of the coverage threshold established by the paid premium.  Therefore, this factor weighs in Hartford's favor.

Given that the first factor is neutral, and that the second and third factors weigh in Hartford's favor, the Court finds that Hartford's interpretation of the plan is "legally correct" and, as such, "the inquiry ends and there is no abuse of discretion."  *Stone*, 570 F.3d at 257.

---

[41] R. Doc. No. 33-2, pp.  5-8.
[42] R. Doc. No. 33-2, pp. 48-50.
[43] R. Doc. No. 32-1, p. 20.

However, out of an abundance of caution, the Court will proceed to the second step and determine whether Hartford's decision was an abuse of discretion. *Blankenship v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 1552812, at *4 (E.D. La. April 14, 2010) (Englehardt, J.) ("While there is no need to determine whether Defendant abused its discretion, this Court will nonetheless continue in its analysis in the event that Defendant's determination was not legally correct.") (footnote omitted) (citing *Stone*, 570 F.3d at 258).

### V.     Second Step: Abuse of Discretion

A plan administrator abuses his discretion where the decision is not " 'based on evidence, even if disputable, that clearly supports the basis for its denial.' " *Lain v. UNUM Life Ins. Co. of America*, 279 F.3d 337, 342 (5th Cir. 2002) (quoting *Vega v. Nat'l Life Ins. Servs.*, 188 F.3d 287, 299 (5th Cir. 1999) (en banc)).  A court must find that an administrator has abused its discretion only when "the plan administrator acted arbitrarily or capriciously."  *Holland*, 576 F.3d at 246 (quoting  *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.* 168 F.3d 211, 214 (5th Cir. 1999)). "A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence."  *Id.* (citing *Meditrust*, 168 F.3d at 215)).  A court's "review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness – even if on the low end."  *Id.* at 247 (quoting *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007) (internal quotation marks omitted)).

When analyzing whether an administrator has abused its discretion in its interpretation of the plan, a court must weigh four factors: (1) the plan's internal consistency under the administrator's interpretation, (2) any relevant regulations, (3) the factual background underlying the decision, and (4) any indication of lack of good faith.  *Lain*, 279 F.3d at 346.  Furthermore, if

14

the administrator has a conflict of interest, the court must "weigh the conflict of interest as a factor in determining whether there is an abuse of discretion in the benefits denial, meaning we take account of several different considerations of which conflict of interest in one." *Holland*, 576 F.3d at 247 (quoting *Crowell*, 541 F.3d at 312 (quotation marks and footnotes omitted) (quoting *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2350-51 (2008))).  With respect to how an administrator's conflict of interest must be accounted for under abuse of discretion review, the U.S. Supreme Court in *Glenn* eschewed "special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict." *Id.* (quoting *Glenn*, 128 S. Ct. at 2351).  Rather, the Supreme Court held that weighing a conflict of interest as a factor does not "impl[y] a change in the *standard* of review, say, from deferential to *de novo* review." *Id.* (footnote omitted) (quoting *Glenn*, 128 S. Ct. at 2350).  "Quite simply, 'conflicts are but one factor among many that a reviewing judge must take into account.' " *Id.* at 247-48 (quoting *Glenn*, 128 S. Ct. at 2351).

With respect to the policy's internal consistency, as discussed, *supra*, regarding whether Hartford's interpretation of "overtime" was "legally correct," the Court finds that Hartford's interpretation does not result in any internal consistencies in the policy.  As to any relevant regulations *vis-à-vis* the policy, the Court has already discussed the relevance of the FLSA's mandate that employers provide overtime wages for hours worked in excess of forty hours per week.  Furthermore, Marshall does not identify any other regulations that the Court should consider in its analysis.  *Lain*, 279 F.3d at 346.  Regarding the factual background underlying the decision and any indications of lack of good faith, Marshall has not argued that Hartford has refused to pay any LTD benefits to compensate him for his disability.  *Id.*  Again, the only

contention between the parties is the baseline wage rate to be used in calculating Marshall's benefits.

Consequently, the remaining concern that the Court must consider goes to Hartford's purported conflict of interest. Marshall correctly argues that, as Hartford both evaluates claims and pays benefits, it has a structural conflict of interest.[44] *Holland*, 576 F.3d at 248. Marshall contends that this conflict of interest, and Hartford's offer to settle his claim "on the cheap," demonstrates such clear bias that this Court must conclude that Hartford has abused its discretion in its policy interpretation.[45] However, as the Fifth Circuit recently recognized following the U.S. Supreme Court's decision in *Glenn*, an administrator's conflict of interest is just one factor that a court must consider and the standard of review remains whether the administrator abused its discretion. *Id.* at 247-48.

The Court recognizes that Hartford does have a conflict of interest. Yet, the Court finds Marshall's argument that Hartford is clearly biased because it made a low lump-sum settlement offer unpersuasive. Without evidence of bias beyond Marshall's conclusory argument, and given that Hartford's benefits calculation is predicated on the policy's plain language excluding overtime, the Court finds that Hartford's decision is reasonable and that Hartford has not abused its discretion. *Id.* at 247.

### CONCLUSION

Accordingly, **IT IS ORDERED** that Hartford's motion[46] for summary judgment is **GRANTED** and that Marshall's motion[47] for summary judgment is **DENIED**.

---

[44] R. Doc. No. 33-1, p. 7.
[45] R. Doc. No. 33-1, pp. 7-8.
[46] R. Doc. No. 32.
[47] R. Doc. No. 33.

16

**IT IS FURTHER ORDERED** that Marshall's claims against Hartford are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, September ___12th___, 2011.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**